**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

FRANK RALPH LaPENA,

      Petitioner,                             2:00-cv-0960-PMP-NJK

vs.

                                               **ORDER**

GEORGE GRIGAS, *et al.*,

      Respondents.

_____/

Introduction, Factual Summary, and Procedural Background

       This action is a petition for a writ of habeas corpus by Frank Ralph LaPena, who, in a second trial, in 1989, was convicted of first degree murder and robbery with the use of a deadly weapon, and who is now on parole. Respondents have filed an answer (ECF No. 40), and LaPena has filed a reply to the answer (ECF No. 57). In their answer, respondents contend that several of LaPena's claims are unexhausted in state court. In this order, the court addresses those contentions, and concludes that Grounds 5, 6, and 7 of LaPena's petition are unexhausted. The court orders LaPena to make an election regarding those unexhausted claims.

       In its opinion dismissing LaPena's appeal from his 1989 conviction, the Nevada Supreme Court summarized the facts, as disclosed by the evidence at trial, as follows:

1

2

3

Frank LaPena was found guilty of initiating the contract murder of Hilda Krause, 71, at her home on January 14, 1974.  Marvin Krause, her husband, was at that time the slot manager for Caesar's Palace in Las Vegas.  He was knocked senseless.  One Gerald Weakland, who had agreed to execute the murder contract, and an associate, escaped with assorted jewelry and a TV set.

4

5

6

7

Within a few days, a police confidential informant pointed a finger at Gerald Weakland.  Eventually a "love" triangle emerged.  Marvin Krause was involved with Rosalie Maxwell, a cocktail waitress at Caesar's.  Maxwell was also involved with Frank LaPena, whom she described to police as her "true love" while Mr. Krause was her "live one."  LaPena, a bell captain at Caesar's, told the police that he knew about the Krause-Maxwell relationship and "he didn't care as long as the money kept coming in."

8

9

10

According to Weakland's testimony, with Hilda Krause out of the way, Rosalie would then be free to marry Marvin Krause.  LaPena would be the ultimate financial beneficiary.  For his part, Weakland was offered $1,000 in advance and $10,000 in the future; in addition, considerable sums that Weakland, an inveterate gambler, owed LaPena, would be forgiven.

11

Order Dismissing Appeal, Exhibit L, pp. 1-2 (opinion published as *LaPena v. State*, 107 Nev. 1126,

12

838 P.2d 947 (1991)).[1]  In its 1998 opinion, reversing the state district court's judgment granting

13

LaPena post-conviction relief, the Nevada Supreme Court provided more factual detail, and the

14

procedural background of the case up to that point:

15

16

17

18

19

At approximately 5:00 a.m. on January 14, 1974, the elderly couple of Hilda and Marvin Krause were robbed at their Las Vegas home located inside a walled country club community.  During the course of the robbery, the perpetrators beat Mr. Krause and murder Mrs. Krause.  When police arrived at the Krause home, they found the deceased Mrs. Krause gagged with a scarf tied loosely around her neck, and a butcher knife imbedded in her back; her throat had been slit.  An autopsy revealed that Mrs. Krause had been strangled with a cord or rope prior to having her throat slit and that she had sustained several stab wounds to her neck after her throat had been slit.

20

21

22

23

24

25

Mr. Krause told police that he had been attacked by two Caucasian men after he opened his garage door and as he was getting into his car to go to work.  The men forced him into the house where they beat him and tied him up, murdered Mrs. Krause, and stole a television, gold coins, and jewelry, including a diamond ring and a watch.  Mr. Krause reported that after the assailants left his home, he untied himself and went upstairs in an attempt to aid Mrs. Krause.  Physical evidence indicated that at least two perpetrators had been present at the Krause home.  The perpetrators left the scene in Mr. Krause's car but abandoned it at the gates of the country club.  Mr. Krause suffered a head injury in the attack; he died the following year from unrelated causes.

26

---

[1] Unless otherwise noted, the exhibits referred to in this order are those filed by respondents, and located in the record at ECF Nos. 41-54.

Several days after the crime had been committed, a confidential informant (later identified as Joey Costanza) contacted Las Vegas Metropolitan Police Department (LVMPD) Detective Mike Whitney.  Costanza told Det. Whitney that approximately six weeks before the Krause robbery/murder, Gerald Weakland had approached him about assisting in a robbery/murder to take place in the early morning hours of a Monday or Friday before one fo the victims went to work and would involve scaling a wall of some sort.  Costanza allegedly knew the exact location of the crime scene (i.e., the Krauses' address).  Costanza also mentioned two other individuals who might have been solicited or involved in the crime – Tom Boutwell and Bobby Webb.

Det. Whitney gave this information to several police officers, including Lieutenant Beecher Avants and Detective Chuck Lee, who subsequently questioned Boutwell, Webb, and Weakland.  In a February 1974 telephone conversation between Lt. Avants and Costanza, Costanza allegedly stated that he had never heard the names of LaPena or Rosalie Maxwell, LaPena's girlfriend, associated with Weakland or the Krause crimes.   Police arrested Weadland for the Krause murder/robbery in March 1974.

During a preliminary hearing, Weakland admitted to the crimes and struck a deal with the State wherein he agreed to testify that Maxwell and LaPena had hired him to murder Mrs. Krause.  In exchange for this testimony, Weakland was allowed to plead guilty to second degree murder, with a sentence of five years to life, and all other charges against him (some of which were unrelated to the Krause crimes) were dropped.  In his March 29, 1974, confession, Weakland told authorities that while Boutwell, his accomplice, was robbing the Krause home, he slipped upstairs and murdered Mrs. Krause by slitting her throat with a single cut.  Weakland maintained that he had not strangled Mrs. Krause or stabbed her in the neck.  Weakland maintained that LaPena, an acquaintance to whom he owed money, had approached him at the end of December 1973, and asked him to kill Mrs. Krause.  LaPena allegedly explained to Weakland that Mr. Krause was a wealthy slot manager at Caesar's Palace who was dating LaPena's girlfriend, Maxwell, who also worked at Caesar's.  LaPena and Maxwell wanted Weakland to kill Mrs. Krause so that Maxwell could marry Mr. Krause and inherit the Krause fortune for the benefit of herself and her boyfriend, LaPena.

Weakland claimed that LaPena had offered to forgive his debts and pay him a large sum of money in exchange for Mrs. Krause's murder.  On January 4, 1974, Weakland went to Maxwell's apartment where she and LaPena gave him $1000 as a down payment for the murder, told him that he would received another $10,000 after Maxwell married Mr. Krause, and explained the "plan" for robbing the Krauses and murdering Mrs. Krause.  Maxwell allegedly gave Weakland a map of the Krauses' residence during this meeting.  Weakland stated that he asked Webb to help him commit the crime but, ultimately, Boutwell accompanied him.  Weakland told police that he ahd never spoken to or had any contact with Mr. Krause prior to the January 1974 robbery/murder.

Based upon Weakland's statements to the police, on April 23, 1974, LaPena and Maxwell were arrested for the Krause robbery/murder.  Both were charged with first degree murder and robbery with the use of a deadly weapon.  The criminal complaint alleged that LaPena  and Maxwell had entered into a contract with Gerald Weakland "whereby ... Weakland was to kill [Mrs. Krause]."

Weakland testified to LaPena's guilt at LaPena's preliminary hearing; however, at both Maxwell's and LaPena's separate trials, Weakland testified that his prior testimony and statements implicating LaPena and Maxwell in the murder were false. *LaPena v. State*, 98 Nev. 135, 136, 643 P.2d 244, 244 (1982). Maxwell was acquitted at trial, but LaPena was convicted by a jury of one count of first degree murder and one count of robbery with the use of a deadly weapon.

On direct appeal, this court reversed LaPena's conviction and remanded for a new trial on the ground that admission of Weakland's statements incriminating LaPena constituted reversible error. This court concluded that the State had improperly withheld "the benefits of a plea bargain or promise of leniency until after a purported accomplice [ (i.e., Weakland) ] had testified in a particular manner." *Id*. at 136-37, 643 P.2d at 244-45. Weakland was eventually charged with two counts of perjury, to which he entered an Alford plea and received probation.

\*   \*   \*

LaPena's second jury trial commenced in May 1989, and he was again convicted of first degree murder and robbery with the use of a deadly weapon. LaPena did not testify on his own behalf. The trial court sentenced LaPena to life imprisonment without the possibility of parole for the murder of Mrs. Krause, and a concurrent thirty-year sentence for the robbery of the Krause home with the use of a deadly weapon. This court [the Nevada Supreme Court] affirmed LaPena's conviction and sentence. LaPena v. State, Docket No. 20436, 107 Nev. 1126, 838 P.2d 947 (Order Dismissing Appeal, June 27, 1991).

\*   \*   \*

On June 3, 1992, LaPena filed the PCR [post-conviction relief] petition at issue. The district court denied LaPena's PCR petition without conducting an evidentiary hearing. On appeal, this court remanded the matter for an evidentiary hearing. *LaPena v. State*, Docket No. 23839, 109 Nev. 1404, 875 P.2d 1066 (Order of Remand, November 24, 1993). On December 3, 1993, LaPena filed a motion to dismiss the indictment based upon an alleged lack of evidence and a colorable claim of factual innocence." LaPena's motion to dismiss was subsequently consolidated with the PCR petition, and LaPena presented evidence in support of dismissal at the evidentiary hearing.

The district court conducted the evidentiary hearing October 16-20, 1995. The district court then granted LaPena's PCR petition and vacated his conviction and sentence on the ground that LaPena had not received effective assistance of trial counsel. The district court denied LaPena's motion to dismiss and ordered the matter reset for a new trial.

December 7, 1998 Opinion of the Nevada Supreme Court, Exhibit R, pp. 2-5 (opinion published as

*State v. LaPena*, 114 Nev. 1159, 968 P.2d 750 (1998)).

On the State's appeal from the grant of post-conviction relief, the Nevada Supreme Court

ruled that "[t]he district court erred in granting respondent's petition for post-conviction relief on the

4

1  basis of ineffective assistance of counsel." *Id*. at 5.  The Nevada Supreme Court, therefore, reversed

2  the state district court's judgment granting LaPena post-conviction relief.  *Id*. at 11.

3     LaPena initiated this federal habeas corpus action by submitting a petition for writ of habeas

4  corpus for filing on August 3, 2000.  *See* Petition for Writ of Habeas Corpus, ECF No. 7.

5     On February 13, 2001, the respondents filed a motion to dismiss (ECF No. 16), seeking

6  dismissal of the action "on the grounds that the instant petition contains claims substantially similar

7  to habeas corpus claims currently being litigated in the Nevada State courts, and that the State

8  courts should be given an opportunity to complete that pending litigation before federal habeas

9  proceedings are initiated."  Motion to Dismiss (ECF No. 16), p. 1.  The court denied that motion

10  on September 10, 2001 (ECF No. 29).

11     Respondents filed their answer on November 14, 2001 (ECF No. 40).  LaPena then filed

12  his reply to the answer (entitled "Petitioner's Partial Response in Opposition to Respondents

13  Answer that Petitioner's Habeas Grounds Two-Three; Five-Six & Seven Are Unexhausted") on

14  December 13, 2001,  (ECF No. 57).

15     On July 24, 2002, the court dismissed the action on the ground that it was untimely, as it was

16  filed outside the applicable limitations period.  *See* Report and Recommendation (ECF No. 60);

17  Amended Order entered July 24, 2002 (ECF No. 67); Amended Judgment (ECF No. 68).  LaPena

18  appealed (ECF No. 69).  On October 20, 2003, the Ninth Circuit Court of Appeals reversed and

19  remanded, upon the State's concession that the district court had not considered the tolling effect,

20  under 28 U.S.C. § 2244(d)(2), of all of LaPena's state court post-conviction litigation.  *See*

21  Memorandum, ECF No. 77.

22     Following the remand, on March 15, 2004, LaPena filed a motion to supplement his habeas

23  petition (ECF Nos. 84, 85), which was ultimately denied.

24     Along with his motion to supplement petition, on March 15, 2004, LaPena filed exhibits

25  (ECF Nos. 84, 85, 86, 87) revealing that on March 26, 1999, he had initiated a second state court

26  habeas action.  *See* Order of Affirmance, Exhibit 17 to Motion to Supplement Petition.  In

1  that case, the state trial court conducted evidentiary hearings, and then denied the petition, and on

2  May 22, 2003, the Nevada Supreme Court affirmed. *Id.*

3  Exhaustion

4      In their answer to LaPena's habeas petition, respondents take the position that several of his

5  claims are unexhausted in state court.

6      A federal court may not grant habeas corpus relief on a claim not exhausted in state court.

7  28 U.S.C. § 2254(b). The exhaustion doctrine is based on the policy of federal-state comity, and is

8  intended to allow state courts the initial opportunity to correct constitutional deprivations. *See*

9  *Picard v. Conner*, 404 U.S. 270, 275 (1971). To exhaust a claim, a petitioner must fairly present the

10  claim to the highest state court, and must give that court the opportunity to address and resolve it.

11  *See Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*); *Keeney v. Tamayo-Reyes*, 504 U.S. 1,

12  10 (1992).

13      The court has examined the record to determine the status of each of LaPena's claims, vis-a-

14  vis the exhaustion of each claim in state court. The court sets forth its findings in this regard below,

15  and directs LaPena to make an election with respect to his unexhausted claims.

16      Ground 1

17      In Ground 1 of his habeas petition, LaPena claims that his rights under the Fourteenth

18  Amendment to the United States Constitution were violated because of "[i]nability of defense to

19  secure the attendance of a crucial material witness," and "refusal of trial judge to allow investigator

20  funds and access to seucre his attendance or deposition." Petition for Writ of Habeas Corpus (ECF

21  No. 7), p. 3. The subject of Ground 1 is Joseph Costanza. *See id.* at 3-3E. Respondents concede

22  that this claim has been exhausted in state court. *See* Answer, p. 15.

23      Grounds 2 and 3

24      In Ground 2, LaPena claims that his rights under the Fourteenth Amendment to the United

25  States Constitution were violated because the "State withheld exculpatory evidence before the grand

26  jury to obtain a true bill and grand jury indictment." Petition for Writ of Habeas Corpus, p. 5. And,

similarly, in Ground 3, LaPena claims that his rights under the Fourteenth Amendment to the United States Constitution were violated because the of the State's "withholding of exculpatory evidence from the grand jury and prosecutorial misconduct." *Id*. at 7.

Respondents argue that Grounds 2 and 3 are unexhausted, as somewhat similar claims were raised in state court, on LaPena's direct appeal, as only state-law claims.  However, LaPena points out that in his reply brief, on his direct appeal to the Nevada Supreme Court, he did in fact cite federal cases, indicating that he raised federal constitutional claims with respect to the presentation of the case to the grand jury. *See* Appellant's Reply Brief, Exhibit K, pp. 19-21.  Grounds 2 and 3 are exhausted.

Ground 4

In Ground 4, LaPena claims that his rights under the Fifth Amendment to the United States Constitution were violated because the "State failed to prove each and every element of crimes beyond a reasonable doubt [and] there was insufficient evidence of accomplice testimony."  Petition for Writ of Habeas Corpus, p. 9.  Respondents concede that this claim has been exhausted in state court. *See* Answer, p. 24.

Ground 5

In Ground 5, LaPena claims that his rights under the Fifth Amendment to the United States Constitution were violated because "[t]he District Court restriction of the cross-examination of Gerald Weakland deprived Petitioner of a fair trial."  Petition for Writ of Habeas Corpus, p. 11. Respondents argue that Ground 5 is unexhausted, as it was presented in state court, on LaPena's direct appeal, as only a state-law claim.

The court finds that Ground 5 was not exhausted in state court.  LaPena did not cite federal authority in his argument, on his direct appeal, regarding the trial judge's alleged improper restriction of the cross examination of Gerald Weakland. *See* Appellant's Opening Brief, Exhibit H, pp. 41-43; Appellant's Reply Brief, Exhibit K, pp. 39-41.  LaPena's cryptic statement, in his direct appeal briefing, that "the limitation violated Appellant's right to confront his accusers in yet another

way," was not sufficient to fairly present this federal constitutional claim to the Nevada Supreme Court and give that court the opportunity to address and resolve it.  *See Duncan*, 513 U.S. at 365; *Keeney*, 504 U.S. at 10; *see also Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir.1999) ("[G]eneral appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial," do not establish exhaustion.).  Ground 5 is unexhausted.

Ground 6

In Ground 6, LaPena claims that his rights under the Fifth Amendment to the United States Constitution were violated because the "Trial Court refused to allow a jury instruction directly relating to Petitioner's theory of defense which was supported by substantial evidence."  Petition for Writ of Habeas Corpus, p. 13.  Respondents argue that Ground 6 is unexhausted, as it was presented in state court, on LaPena's direct appeal, as only a state-law claim.

In response, LaPena argues that "the constitutional dimension of Petitioner's claim should have been clear to the Nevada Supreme Court" (Reply, p. 9), but he does not point to anything in his briefing before the Nevada Supreme Court that would have alerted that court that this was a claim of a federal constitutional violation.  *See* Reply, pp. 8-9; *see also* Appellant's Supplemental Brief, Exhibit I, pp. 1-4; Appellant's Reply Brief, Exhibit K, pp. 41-44.

Ground 6 is unexhausted.

Ground 7

In Ground 7, LaPena claims that his rights under the Fifth Amendment to the United States Constitution were violated because the "Trial Judge exercised actual bias and prejudice towards Petitioner prior to, during and after trial denying Petitioner his constitutional right to a fair and impartial trial."  Petition for Writ of Habeas Corpus, p. 15.  Respondents argue that Ground 7 is unexhausted, as it was presented in state court, on LaPena's direct appeal, as only a state-law claim.

Here, in response, LaPena argues that this claim was exhausted in state court, as a federal constitutional claim, because the State included the following in its argument, in its answering brief before the Nevada Supreme Court:

8

In *United States v. Polizzi*, 500 F.2d 856 (9th Cir.1974), the Ninth Circuit Court of Appeals stated:

> [F]ew, if any judges can altogether avoid words or action, inadvertent or otherwise, which seem inappropriate when later examined in the calm cloisters of the appellate court.  But unless such misadventures so persistently pervade the trial or, considered individually or together, are of such magnitude that a court-room climate unfair to the defendant is discernible from the cold record, the defendant is not sufficiently aggrieved to warrant a new trial.

*Id*., at 892, quoting, *Smith v. United States*, 305 F.2d 197, 205 (9th Cir.1962); *cert. denied*, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.124 (1962).

Respondent's Answering Brief, Exhibit J, pp. 46-47.  That argument, by the State, did not fairly alert the Nevada Supreme Court to a federal constitutional claim.  On his direct appeal, LaPena simply did not assert a federal constitutional claim with respect to the alleged bias of the trial judge.

LaPena also argues that he exhausted this federal constitutional claim in state court on account of arguments that he made in the state district court in a post-trial motion to disqualify the trial judge.  *See* Reply, p. 10.  Exhaustion, however, must be accomplished in the highest state court. *See Duncan*, 513 U.S. at 365.  There is no showing that LaPena ever asserted in the Nevada Supreme Court his federal constitutional claim regarding the alleged bias of the trial judge.

Ground 7 is unexhausted.

Ground 8

In Ground 8, LaPena claims that his rights under the Sixth Amendment to the United States Constitution were violated because of ineffective assistance of counsel at trial and on appeal. Petition for Writ of Habeas Corpus, p. 17.  Respondents concede that this claim has been exhausted in state court.  *See* Answer, p. 43.

Ground 9

LaPena characterizes Ground 10 as a "Motion to Dismiss on grounds Petitioner is factually innocent and is being illegally and unconstitutionally detained and imprisoned for a crime he did not commit."  Petition for Writ of Habeas Corpus, p. 19.  Respondents appear to construe Ground 9 as a claim that there was insufficient evidence presented at trial to convict LaPena of murder, and treat

9

Ground 9 together with Ground 4; respondents concede that both of those grounds have been exhausted in state court.  Answer, pp. 23-24.

Ground 10

In Ground 10, LaPena claims that his rights under the Fourteenth Amendment to the United States Constitution were violated because the "State withheld *Brady* material from the defense and violated the Mandate of the Nevada Supreme Court."  Petition for Writ of Habeas Corpus, p. 21. Respondents concede that this claim has been exhausted in state court.  *See* Answer, p. 53.

LaPena's Election

As is discussed above, the court finds Grounds 5, 6, and 7 of LaPena's habeas petition to be unexhausted in state court.  With respect to those claims, the court will direct LaPena to make an election.  LaPena must either file a notice of abandonment of Grounds 5, 6, and 7, indicating that he elects to abandon those unexhausted claims and proceed with the litigation of his remaining exhausted claims (Grounds 1, 2, 3, 4, 8, 9, and 10), or alternatively, file a motion for stay, requesting a stay of these proceedings to allow him to return to state court to exhaust the unexhausted claims. If LaPena elects to file a motion for stay, he must make a showing that a stay is warranted, as prescribed in the Supreme Court case of *Rhines v. Weber*, 544 U.S. 269 (2005).  If petitioner does not, within the time allowed, file a notice of abandonment of all his unexhausted claims, or a motion for a stay to allow exhaustion of his unexhausted claims in state court, LaPena's entire petition for writ of habeas corpus will be dismissed pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982).

**IT IS THEREFORE ORDERED** that petitioner shall have **30 days**, from the date this order is entered, to file a notice of abandonment of all his unexhausted claims (Grounds 5, 6, and 7), or a motion for a stay to allow exhaustion of his unexhausted claims in state court, as described in more detail above.

**IT IS FURTHER ORDERED** that, if petitioner files a notice of abandonment of all his unexhausted claims, the case will remain under submission to the court with respect to the merits of petitioner's remaining exhausted claims (Grounds 1, 2, 3, 4, 8, 9, and 10).

1       **IT IS FURTHER ORDERED** that, if petitioner files a  motion for a stay to allow

2   exhaustion of his unexhausted claims in state court, respondents shall thereafter have 30 days to file

3   a response to that motion, and petitioner shall thereafter have 20 days to file a reply.

4       **IT IS FURTHER ORDERED** that, if petitioner does not, within the time allowed, file a

5   notice of abandonment of all his unexhausted claims, or a motion for a stay to allow exhaustion of

6   his unexhausted claims in state court, petitioner's entire petition for writ of habeas corpus will be

7   dismissed pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982).

8

9       Dated this _12th_ day of May, 2014.

10

11   _____

12   UNITED STATES DISTRICT JUDGE