UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| FRANK RALPH LaPENA, | |
| Petitioner, | 2:00-cv-00960-RFB-NJK |
| vs. | **ORDER** |
| GEORGE GRIGAS, *et al.*,[1] | |
| Respondents. | |

Introduction

    This action is a petition for a writ of habeas corpus by Frank Ralph LaPena, who in 1989 was convicted, after a second trial, of first degree murder and robbery with the use of a deadly weapon. The case is before the court with respect to the merits of the claims remaining in LaPena's habeas corpus petition. The court denies LaPena's habeas petition, denies LaPena a certificate of appealability, and directs the clerk of the court to enter judgment accordingly.

---

[1] On March 26, 2015, respondents filed a motion for substitution of respondent (ECF No. 142), requesting that Adam Paul Laxalt be substituted for Frankie Sue Del Papa as the respondent Attorney General of the State of Nevada, as Laxalt now holds that office. LaPena did not respond to that motion. Pursuant to Federal Rule of Civil Procedure 25(d), and good cause appearing, the court will grant respondents' motion, and direct the clerk of the court to update the docket for this case to reflect the substitution.

Factual Background and Procedural History

In its opinion dismissing LaPena's appeal from his 1989 conviction, the Nevada Supreme Court summarized the facts, as disclosed by the evidence at trial, as follows:

> ... Frank LaPena was found guilty of initiating the contract murder of Hilda Krause, 71, at her home on January 14, 1974. Marvin Krause, her husband, was at that time the slot manager for Caesar's Palace in Las Vegas. He was knocked senseless. One Gerald Weakland, who had agreed to execute the murder contract, and an associate, escaped with assorted jewelry and a TV set.
>
> Within a few days, a police confidential informant pointed a finger at Gerald Weakland. Eventually a "love" triangle emerged. Marvin Krause was involved with Rosalie Maxwell, a cocktail waitress at Caesar's. Maxwell was also involved with Frank LaPena, whom she described to police as her "true love" while Mr. Krause was her "live one." LaPena, a bell captain at Caesar's, told the police that he knew about the Krause-Maxwell relationship and "he didn't care as long as the money kept coming in."
>
> According to Weakland's testimony, with Hilda Krause out of the way, Rosalie would then be free to marry Marvin Krause. LaPena would be the ultimate financial beneficiary. For his part, Weakland was offered $1,000 in advance and $10,000 in the future; in addition, considerable sums that Weakland, an inveterate gambler, owed LaPena, would be forgiven.

Order Dismissing Appeal, Exhibit L, pp. 1-2.[2] In its 1998 opinion, reversing the state district court's judgment granting LaPena post-conviction relief, the Nevada Supreme Court provided more factual detail, and the procedural background of the case to that point:

> At approximately 5:00 a.m. on January 14, 1974, the elderly couple of Hilda and Marvin Krause were robbed at their Las Vegas home located inside a walled country club community. During the course of the robbery, the perpetrators beat Mr. Krause and murdered Mrs. Krause. When police arrived at the Krause home, they found the deceased Mrs. Krause gagged with a scarf tied loosely around her neck, and a butcher knife imbedded in her back; her throat had been slit. An autopsy revealed that Mrs. Krause had been strangled with a cord or rope prior to having her throat slit and that she had sustained several stab wounds to her neck after her throat had been slit.
>
> Mr. Krause told police that he had been attacked by two Caucasian men after he opened his garage door and as he was getting into his car to go to work. The men forced him into the house where they beat him and tied him up, murdered Mrs. Krause, and stole a television, gold coins, and jewelry, including a diamond ring and a watch. Mr. Krause reported that after the assailants left his home, he untied himself and went upstairs in an attempt to aid Mrs. Krause. Physical evidence indicated that at least two perpetrators had been present at the Krause home. The perpetrators left the scene in Mr. Krause's car but abandoned it at the gates of the country club. Mr. Krause suffered a

---

[2] Unless otherwise stated, the exhibits referred to in this order are those filed by respondents, and located in the record at ECF Nos. 41-54.

head injury in the attack; he died the following year from unrelated causes.

Several days after the crime had been committed, a confidential informant (later identified as Joey Costanza) contacted Las Vegas Metropolitan Police Department (LVMPD) Detective Mike Whitney. Costanza told Det. Whitney that approximately six weeks before the Krause robbery/murder, Gerald Weakland had approached him about assisting in a robbery/murder to take place in the early morning hours of a Monday or Friday before one of the victims went to work and would involve scaling a wall of some sort. Costanza allegedly knew the exact location of the crime scene (i.e., the Krauses' address). Costanza also mentioned two other individuals who might have been solicited or involved in the crime – Tom Boutwell and Bobby Webb.

Det. Whitney gave this information to several police officers, including Lieutenant Beecher Avants and Detective Chuck Lee, who subsequently questioned Boutwell, Webb, and Weakland. In a February 1974 telephone conversation between Lt. Avants and Costanza, Costanza allegedly stated that he had never heard the names of LaPena or Rosalie Maxwell, LaPena's girlfriend, associated with Weakland or the Krause crimes. Police arrested Weakland for the Krause murder/robbery in March 1974.

During a preliminary hearing, Weakland admitted to the crimes and struck a deal with the State wherein he agreed to testify that Maxwell and LaPena had hired him to murder Mrs. Krause. In exchange for this testimony, Weakland was allowed to plead guilty to second degree murder, with a sentence of five years to life, and all other charges against him (some of which were unrelated to the Krause crimes) were dropped. In his March 29, 1974, confession, Weakland told authorities that while Boutwell, his accomplice, was robbing the Krause home, he slipped upstairs and murdered Mrs. Krause by slitting her throat with a single cut. Weakland maintained that he had not strangled Mrs. Krause or stabbed her in the neck. Weakland maintained that LaPena, an acquaintance to whom he owed money, had approached him at the end of December 1973, and asked him to kill Mrs. Krause. LaPena allegedly explained to Weakland that Mr. Krause was a wealthy slot manager at Caesar's Palace who was dating LaPena's girlfriend, Maxwell, who also worked at Caesar's. LaPena and Maxwell wanted Weakland to kill Mrs. Krause so that Maxwell could marry Mr. Krause and inherit the Krause fortune for the benefit of herself and her boyfriend, LaPena.

Weakland claimed that LaPena had offered to forgive his debts and pay him a large sum of money in exchange for Mrs. Krause's murder. On January 4, 1974, Weakland went to Maxwell's apartment where she and LaPena gave him $1000 as a down payment for the murder, told him that he would receive another $10,000 after Maxwell married Mr. Krause, and explained the "plan" for robbing the Krauses and murdering Mrs. Krause. Maxwell allegedly gave Weakland a map of the Krauses' residence during this meeting. Weakland stated that he asked Webb to help him commit the crime but, ultimately, Boutwell accompanied him. Weakland told police that he had never spoken to or had any contact with Mr. Krause prior to the January 1974 robbery/murder.

Based upon Weakland's statements to the police, on April 23, 1974, LaPena and Maxwell were arrested for the Krause robbery/murder. Both were charged with first degree murder and robbery with the use of a deadly weapon. The criminal complaint alleged that LaPena and Maxwell had entered into a contract with Gerald Weakland "whereby ... Weakland was to kill [Mrs. Krause]."

> Weakland testified to LaPena's guilt at LaPena's preliminary hearing; however, at both Maxwell's and LaPena's separate trials, Weakland testified that his prior testimony and statements implicating LaPena and Maxwell in the murder were false. *LaPena v. State*, 98 Nev. 135, 136, 643 P.2d 244, 244 (1982). Maxwell was acquitted at trial, but LaPena was convicted by a jury of one count of first degree murder and one count of robbery with the use of a deadly weapon.
>
> On direct appeal, this court reversed LaPena's conviction and remanded for a new trial on the ground that admission of Weakland's statements incriminating LaPena constituted reversible error. This court concluded that the State had improperly withheld "the benefits of a plea bargain or promise of leniency until after a purported accomplice [(i.e., Weakland)] had testified in a particular manner." *Id*. at 136-37, 643 P.2d at 244-45. Weakland was eventually charged with two counts of perjury, to which he entered an Alford plea and received probation.
>
> \* \* \*
>
> LaPena's second jury trial commenced in May 1989, and he was again convicted of first degree murder and robbery with the use of a deadly weapon. LaPena did not testify on his own behalf. The trial court sentenced LaPena to life imprisonment without the possibility of parole for the murder of Mrs. Krause, and a concurrent thirty-year sentence for the robbery of the Krause home with the use of a deadly weapon. This court [the Nevada Supreme Court] affirmed LaPena's conviction and sentence. *LaPena v. State*, Docket No. 20436, 107 Nev. 1126, 838 P.2d 947 (Order Dismissing Appeal, June 27, 1991).
>
> \* \* \*
>
> On June 3, 1992, LaPena filed the PCR [post-conviction relief] petition at issue. The district court denied LaPena's PCR petition without conducting an evidentiary hearing. On appeal, this court remanded the matter for an evidentiary hearing. *LaPena v. State*, Docket No. 23839, 109 Nev. 1404, 875 P.2d 1066 (Order of Remand, November 24, 1993). On December 3, 1993, LaPena filed a motion to dismiss the indictment based upon an alleged lack of evidence and a colorable claim of factual innocence." LaPena's motion to dismiss was subsequently consolidated with the PCR petition, and LaPena presented evidence in support of dismissal at the evidentiary hearing.
>
> The district court conducted the evidentiary hearing October 16-20, 1995. The district court then granted LaPena's PCR petition and vacated his conviction and sentence on the ground that LaPena had not received effective assistance of trial counsel. The district court denied LaPena's motion to dismiss and ordered the matter reset for a new trial.

*State v. LaPena*, 114 Nev. 1159,1160-65, 968 P.2d 750, 751-54 (1998) (opinion found in record at Exhibit R).

On the State's appeal from the grant of post-conviction relief, the Nevada Supreme Court ruled that "[t]he district court erred in granting respondent's petition for post-conviction relief on the basis

4

of ineffective assistance of counsel." *LaPena*, 114 Nev. at 1165, 968 P.2d at 754. The Nevada Supreme Court reversed the state district court's judgment granting LaPena post-conviction relief.

LaPena initiated this federal habeas corpus action on August 3, 2000. *See* Petition for Writ of Habeas Corpus, (ECF No. 7). On February 13, 2001, the respondents filed a motion to dismiss (ECF No. 16), seeking dismissal of the action "on the grounds that the instant petition contains claims substantially similar to habeas corpus claims currently being litigated in the Nevada State courts, and that the State courts should be given an opportunity to complete that pending litigation before federal habeas proceedings are initiated." Motion to Dismiss (ECF No. 16), p. 1. The court denied that motion on September 10, 2001 (ECF No. 29).

Respondents filed their answer on November 14, 2001 (ECF No. 40). LaPena then filed his reply to the answer (entitled "Petitioner's Partial Response in Opposition to Respondents Answer that Petitioner's Habeas Grounds Two-Three; Five-Six & Seven Are Unexhausted") on December 13, 2001 (ECF No. 57).

On July 24, 2002, the court dismissed the action on the ground that it was barred by the statute of limitations. *See* Report and Recommendation (ECF No. 60); Amended Order entered July 24, 2002 (ECF No. 67); Amended Judgment (ECF No. 68). LaPena appealed (ECF No. 69), and, on October 20, 2003, the court of appeals reversed and remanded, upon the State's concession that the district court had not considered the tolling effect, under 28 U.S.C. § 2244(d)(2), of all of LaPena's state post-conviction litigation. *See* Memorandum, ECF No. 77.

Following the remand, on March 15, 2004, LaPena filed a motion to supplement his habeas petition (ECF Nos. 84, 85), which was ultimately denied. LaPena appealed from the denial of that motion (ECF No. 100). That appeal was dismissed on October 18, 2005 (ECF No. 117).

Along with his motion to supplement his petition, on March 15, 2004, LaPena filed exhibits (ECF Nos. 84, 85, 86, 87) revealing that on March 26, 1999, he had initiated a second state habeas action. *See* Order of Affirmance, Exhibit 17 to Motion to Supplement Petition. In that case, the state trial court conducted evidentiary hearings, and then denied the petition, and on May 22, 2003, the

Nevada Supreme Court affirmed. *Id*. The Nevada Supreme Court held that LaPena's second state habeas action was procedurally barred. *See* Order of Affirmance, filed May 22, 2003, ECF No. 84, pp. 143-51.

On April 5, 2006, after mail sent to LaPena was twice returned to this court as undeliverable, the court dismissed his action for failure to comply with the local rule requiring litigants to promptly inform the court of changes of their addresses (ECF Nos. 121, 122).

On June 12, 2007, LaPena filed a notice of change of address and a motion to reopen this case (ECF Nos. 124, 125). That motion to reopen the case was denied on August 7, 2007 (ECF No. 126).

Some five years later, on June 1, 2012, LaPena filed another motion to reopen his case (ECF No. 127). In support of that motion, LaPena submitted a copy of a file-stamped notice of change of address dated February 14, 2005. It appeared to the court likely that a clerk's error resulted in the failure to properly file LaPena's notice of change of address, and, in turn, in the dismissal of this case. Therefore, on January 15, 2013, the court granted LaPena's second motion to reopen the case (ECF No. 134).

On May 12, 2014, the court issued an order (ECF No. 136), identifying three claims -- Grounds 5, 6, and 7 -- in LaPena's petition that are unexhausted in state court, and the court ordered LaPena to make an election regarding those unexhausted claims. On May 15, 2014, LaPena filed a notice of abandonment of his unexhausted claims (ECF No. 137).

Grounds 1, 2, 3, 4, 8, 9, and 10, of LaPena's habeas corpus petition remain to be adjudicated on their merits. On July 29, 2014, the court entered an order (ECF No. 139) granting the parties an opportunity to supplement their briefing to take account of any relevant changes in the law in the 13 years since respondents' answer and LaPena's reply were filed. On September 29, 2014, respondents filed a supplement to their answer (ECF No. 140), and on November 24, 2014, LaPena filed a supplemental reply (ECF No. 141).

Standard of Review

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. *See Lindh v.*

*Murphy,* 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003). 28 U.S.C. § 2254(d) sets forth the primary standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

The Supreme Court has further instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786 (2011) (citing

7

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state court's "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). If the last reasoned state-court decision adopts or substantially incorporates the reasoning from a previous state-court decision, a federal habeas court may consider both decisions to ascertain the state court's reasoning. *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

Analysis

Ground 1

In Ground 1 of his habeas petition, LaPena appears to claim that his Fourteenth Amendment right to due process of law was violated because the State impeded the efforts of the defense to secure the testimony of Joseph Costanza. *See* Petition for Writ of Habeas Corpus (ECF No. 7), pp. 3-3E.

LaPena raised such a claim on his direct appeal. *See* Appellant's Opening Brief, Exhibit H, pp. 7-17. The Nevada Supreme Court ruled as follows:

> Appellant ... contends that the State impermissibly interfered with securing a potential defense witness for trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). However, it would appear from a careful review of the record, that the witness himself was principally responsible for his non-appearance, wishing to distance himself from the crime.

Order Dismissing Appeal, Exhibit L, p. 2. This court finds the Nevada Supreme Court's ruling to be objectively reasonable.

"[T]he suppression ... of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecutor." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Brady*, the Supreme Court recognized a prosecutor's

obligation to disclose exculpatory evidence, whether substantive or for impeachment purposes, when such evidence is "material" to the defense. *See id*. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The mere possibility an item of undisclosed information might have helped the defense or affected the outcome of the trial does not establish materiality. *See United States v. Agurs*, 427 U.S. 97, 109 (1976).

Federal habeas corpus relief is only granted if the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court." 28 U.S.C.A. § 2254(a). A *Brady* violation will not result in habeas corpus relief unless the improperly withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

To establish a *Brady* violation, the petitioner must show: that the evidence was favorable to him, either because it is exculpatory or because it is impeaching; that the evidence was willfully or inadvertently suppressed by the prosecution; and that he was prejudiced by the failure to disclose. *Strickler v. Green*, 527 U.S. 263, 281-82 (1999).

There is no showing that the prosecution failed to disclose the identity or whereabouts of Joseph Costanza. Rather, the record reflects that the prosecution made the disclosure to LaPena on October 17, 1983, *some six years before LaPena's second trial*. *See* Transcript of Evidentiary Hearing, Exhibit N, p. 689; *see also LaPena*, 114 Nev. at 1163-65 1171-73, 968 P.2d at 753-54, 758-59. Moreover, LaPena makes no showing that the testimony of Costanza would have been such as to put his case in such a different light as to undermine confidence in the verdict. *See Kyles*, 514 U.S. at 435; *see also LaPena*, 114 Nev. at 1171-73, 968 P.2d at 758-59.

The state court's denial of the claim asserted by LaPena as Ground 1 of his federal habeas petition was not contrary to, or an unreasonable application of *Brady*, or any other clearly established federal law as determined by the Supreme Court, and the state court's ruling was not based on an

unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The court will deny habeas corpus relief with respect to Ground 1.

### Grounds 2 and 3

As the court understands Grounds 2 and 3, LaPena claims that his right to due process of law, under the Fourteenth Amendment, was violated because the State withheld exculpatory evidence before the grand jury. Petition for Writ of Habeas Corpus, pp. 5-5A, 7-7D. LaPena claims that the prosecution did not disclose to the grand jury certain information impacting the credibility of Gerald Weakland and Irwin Fish. *Id*.

LaPena made such a claim on his direct appeal, and the Nevada Supreme Court ruled:

> ... LaPena claims that the prosecution failed to disclose exculpatory conduct to the grand jury, more specifically, "the concessions and benefits bestowed upon Weakland." In the grand jury proceeding, the prosecutor presented all the salient exculpatory evidence relevant to the issues at trial. The grand jury was indisputedly told that Weakland was serving a life sentence for murder, that he had pled to second degree murder in return for his testimony in the first LaPena trial, and that the State's new agreement in the second LaPena trial was an offer to cease writing negative letters in Weakland's regard to the State's Parole Board. Weakland informed the grand jury of the most devastating information about his credibility: convictions for two counts of perjury in connection with an earlier LaPena prosecution. The prosecutor did not divert the attention of the grand jury from the facts. *See Clem v. State*, 104 Nev. 351, 358, 760 P.2d 103, 107 (1988) (overruled on other grounds). We conclude that the grand jury properly "received a fair presentation of the facts...." *Clem*, 104 Nev. at 358, 760 P.2d at 107.

Order Dismissing Appeal, Exhibit L, p. 2.

The state supreme court's ruling was a matter of Nevada law. This court, in a federal habeas corpus action, does not review state-court determinations of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Moreover, LaPena does not cite authority for the proposition that the failure to disclose exculpatory evidence to a grand jury, in a state-court prosecution, violates a defendant's federal constitutional rights. The Fourteenth Amendment does not impose the requirement of indictment by grand jury upon the states. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1188 (9th Cir.1993) (citing *Hurtado*

*v. California*, 110 U.S. 516 (1884), and *Rose v. Mitchell*, 443 U.S. 545, 557 n.7 (1979)).

The state court's denial of the claims asserted by LaPena in this case as to Grounds 2 and 3 was not contrary to, or an unreasonable application of any clearly established federal law, as determined by the Supreme Court, and the state court's ruling was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The court will deny habeas corpus relief with respect to Grounds 2 and 3.

Grounds 4 and 9

In Grounds 4 and 9 of his habeas petition, as this court construes those claims, LaPena asserts that his federal constitutional right to due process of law was violated because there was insufficient evidence to convict him of murder. Petition for Writ of Habeas Corpus, pp. 9-9D, 19-19O.

LaPena made such a claim in state court, *see* Exhibit H, p. 28, and the Nevada Supreme Court ruled:

> ... LaPena is correct in stating that the testimony of the various witnesses presents a number of testimonial inconsistencies. The weight and credibility of conflicting testimony is a matter for the jury. *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981). Where there is substantial evidence to support the jury's verdict, it will not be disturbed on appeal. *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).
>
> In order to properly corroborate accomplice testimony, it is enough if circumstances and evidence from other sources tend on the whole to connect the accused with the crime charged. *LaPena v. Sheriff*, 91 Nev. 692, 696, 541 P.2d 907, 910 (1975). Reasonable inferences are permitted. *LaPena v. Sheriff*, 91 Nev. At 696, 541 P.2d at 910. The jury may properly consider the "composite of facts and circumstances." *See LaPena v. State*, 92 Nev. 1, 3, 544 P.2d 1187, 1188 (1976).
>
> In the instant case, Gail Hodges, Weakland's former wife, testified to a series of furtive visits closely tied in time to Hilda Krause's murder. These involved LaPena and Weakland where Weakland demanded that she perform the role of a go-between. The jury could also properly consider that Weakland had a tenuous connection with the Krauses, while LaPena's link was more ominous and direct. In addition, both Maxwell and LaPena tried to plant false leads with the police. LaPena appeared considerably apprehensive when he met with police in order to impart this disinformation. Ms. Hodges testified that Weakland would do anything for LaPena.
>
> The jury was entitled to consider the murder of Hilda Krause as a whole. Her methodical demise with a kitchen knife when she was tightly bound and offered no resistance, while her husband was only beaten and knocked unconscious, raises the inference that more was at stake than the robbery. [Footnote: Jewelry which an accomplice unceremoniously threw away and which troubled Justice Gunderson in his

ten-page dissent to *LaPena v. State*, 92 Nev. 1, 544 P.2d 1187 (1976), would appear to be explained on the basis of a more developed trial record. Weakland secreted away Marvin Krause's valuable diamond-studded watch and ring while giving an accomplice worthless costume jewelry. *See LaPena*, 92 Nev. at 9 n.3, 544 P.2d at 1192 n.3.] Taken together, such factors may be deemed inculpatory, and more than mere coincidence. *LaPena v. Sheriff*, 91 Nev. 692, 696, 541 P.2d 907, 910 (1975). The jury could conclude that the murder was indeed what had been planned all along, a staged execution.

Order Dismissing Appeal, Exhibit L, pp. 3-4.

In addition, in ruling on LaPena's claims of ineffective assistance of counsel, in his first state habeas action, the Nevada Supreme Court commented on LaPena's theory of the case, and the evidence supporting his conviction:

> LaPena theorizes that Mr. Krause killed Mrs. Krause after Weakland left the Krause residence on the morning of January 14, 1974. LaPena relies on the fact that Weakland has consistently stated that he killed Mrs. Krause by slitting her throat; although the autopsy showed multiple stab wounds in Mrs. Krause's neck and strangulation as the cause of death, Weakland maintains that he never stabbed or strangled her. Weakland testified that he did not check to see if Mrs. Krause was alive when he left the scene. LaPena asserts that all of this "exculpatory information" combined with Martinez' testimony at the evidentiary hearing demonstrates his factual innocence and his trial counsel's failure to properly investigate his case. We disagree.
>
> Mills testified that efforts were made to uncover a connection between Weakland and Mr. Krause, and even if counsel had created a stronger connection between Weakland and Mr. Krause, *there was overwhelming evidence that LaPena hired Weakland to commit the murder*. Weakland never named anyone other than LaPena as the person who hired him to kill Mrs. Krause. Also, Webb testified at the 1989 trial that Weakland had told him that LaPena and Maxwell had hired him to kill Mrs. Krause. Also Webb testified at the 1989 trial that Weakland had told him that LaPena and Maxwell had hired him to kill Mrs. Krause. Weakland's accomplice, Boutwell, also testified that LaPena had orchestrated the plan to kill Mrs. Krause. An inmate who had shared a cell with LaPena testified at the second trial that LaPena had admitted his involvement in Mrs. Krause's murder. Det. Lee testified that shortly after the murder, LaPena accompanied Maxwell to the police station for questioning, and when officials interviewed LaPena he was quite upset and emotionally fell apart during the interview. One week later LaPena, still extremely nervous, contacted Det. Lee to tell him that the person who killed Mrs. Krause was an individual identified only as "Charlie the knife from Chicago." Telephone records admitted into evidence revealed that one or two days after the murder, Weakland and his wife called LaPena's residence from the Windsow Hotel in Lake Havasu, where they spent a day or two.
>
> From the evidence presented at the evidentiary hearing, we conclude that LaPena has failed to show that counsel was deficient in pursuing the alleged Krause-Weakland connection; even if counsel was deficient, LaPena failed to show prejudice under [*Strickland v. Washington*, 466 U.S. 668 (1984)]. Having concluded that LaPena was properly convicted at his 1989 trial, we affirm the district court's denial of LaPena's motion to dismiss the charges against him.

*LaPena*, 114 Nev. at 1174, 968 P.2d at 759-60 (emphasis added); *see also id*. at 1167 (pointing out that LaPena's trial counsel extensively cross-examined Weakland regarding the inconsistencies between his testimony and the findings of the coroner); Answer (ECF No. 40), pp. 25-34 (respondents' summary of evidence incriminating LaPena).

With respect to a claim that there was insufficient evidence presented at trial to support a state-court conviction, the role of the federal court is to determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all evidentiary conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.1995) (citation omitted).

Here, while there was conflicting evidence at trial, and while Weakland, one of the prosecution's main witnesses, was subject to significant impeachment, there was plainly sufficient evidence from which a rational trial of fact could have found that LaPena hired Weakland to kill Hilda Krause. The state court's denial of the claims asserted by LaPena as Grounds 4 and 9 of his federal habeas petition was not contrary to, or an unreasonable application of *Jackson*, or any other clearly established federal law, as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The court will deny habeas corpus relief with respect to Grounds 4 and 9.

<u>Ground 8</u>

In Ground 8, LaPena claims that his federal constitutional rights were violated because he received ineffective assistance of trial counsel. Petition for Writ of Habeas Corpus, pp. 17-17Q.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that

the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  *Id*. at 689.  The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Where a state court has adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable under AEDPA is especially difficult. *See Richter*, 562 U.S. at 104-05.  In *Richter*, the Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)].  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at 123, 129 S.Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Richter*, 562 U.S. at 105; *see also Cheney*, 614 F.3d at 994-95 (acknowledging double deference required with respect to state court adjudications of *Strickland* claims).

In LaPena's first state habeas action, the state district court held an extensive evidentiary hearing regarding LaPena's claims of ineffective assistance of counsel.  *See* Exhibit N (transcript of evidentiary hearing).  The state district court granted LaPena relief, but the Nevada Supreme Court reversed, denying LaPena's claims of ineffective assistance of counsel.  *See LaPena*, 114 Nev. at 1165-74, 968 P.2d at 754-60. This court finds the Nevada Supreme Court's exhaustive analysis of LaPena's claims

of ineffective assistance of counsel to be objectively reasonable. *See id*.

The state court's denial of the claims asserted by LaPena as Ground 8 of his federal habeas petition was not contrary to, or an unreasonable application of, *Strickland*, or any other clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The court will deny habeas corpus relief with respect to Ground 8.

Ground 10

In Ground 10, LaPena claims that the State withheld exculpatory material from the defense. Petition for Writ of Habeas Corpus, pp. 21-21E. Specifically, he appears to claim that the following materials were withheld: (a) contents of a New Jersey interview of Costanza by Detective Lee; (b) contents of a Florida interview of Costanza by Detective Lee; (c) contents of a prison interview between Weakland and Detective Lee, and an accompanying statement made by Weakland; and (d) information regarding favors provided to Weakland in exchange for his testimony. *Id*.

Respondents state that this claim has been exhausted in state court, and that the Nevada Supreme Court denied the claim in its 1996 decision, without discussion. Answer, pp. 53-54.

This court concludes that LaPena's *Brady* claims have no merit, and that the state court's denial of them was objectively reasonable.

Regarding the first two categories of material allegedly withheld by the prosecution -- information about interviews of Constanza -- LaPena makes no specific allegations regarding the materiality of the allegedly withheld information, and there is no showing in that regard in LaPena's briefing of the claims. LaPena has not proffered any evidence showing what exculpatory information was allegedly withheld and what bearing it would have had on his trial. LaPena does not show that anything allegedly withheld from the defense regarding Detective Lee's contacts with Costanza was material, such that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Bagley*, 473 U.S. at 682.

. . .

Similarly, with respect to the third and fourth categories of material allegedly withheld by the prosecution -- information about Weakland -- the court discerns no clear allegation, no argument in LaPena's briefing, and no proffer of any evidence, that there was any exculpatory information concerning Weakland withheld from the defense.

Furthermore, one of the prosecutors on LaPena's case testified, at the evidentiary hearing in state court, that the prosecution maintained an open file policy, and handled LaPena's case like any other. *See* Exhibit N, pp. 699-706. He testified that the prosecution withheld no evidence from the defense. *See id*.

This court finds that the Nevada Supreme Court's denial of the claims asserted by LaPena in Ground 10 of his federal habeas petition was not contrary to, or an unreasonable application of, *Brady*, or any other clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The court will deny habeas corpus relief with respect to Ground 10.

Certificate of Appealability

The standard for issuance of a certificate of appealability calls for a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c).

The Supreme Court interpreted 28 U.S.C. §2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). The Supreme Court further illuminated the standard in *Miller-El v. Cockrell*, 537 U.S. 322 (2003). The Court stated in that case:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack*, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Miller-El*, 123 S.Ct. at 1040 (quoting *Slack*, 529 U.S. at 484).

The court has considered LaPena's claims in Grounds 1, 2, 3, 4, 8, 9, and 10, with respect to whether they satisfy the standard for issuance of a certificate of appeal, and the court determines that none of his claims do. The court will deny LaPena a certificate of appealability.

**IT IS THEREFORE ORDERED** that respondents' Motion for Substitution of Respondent (ECF No. 142) is **GRANTED**. The clerk of the court shall update the docket in this case to reflect that Adam Paul Laxalt is substituted for Frankie Sue Del Papa as the respondent Attorney General of the State of Nevada.

**IT IS FURTHER ORDERED** that petitioner Frank Ralph LaPena's Petition for Writ of Habeas Corpus (ECF No. 7) is **DENIED**.

**IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the clerk of the court shall enter judgment accordingly.

Dated this 11th day of May, 2015.

RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE